IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEZBULLAH KAZIMI, <br><br> *Plaintiff* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("DHS"); <br><br> ALEJANDRO MAYORKAS, in his official capacity as Secretary of DHS; <br><br> U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); <br><br> UR MENDOZA JADDOU, in her official capacity as Director of USCIS; <br><br> TED H. KIM, in his official capacity as Associate Director of the Refugee, Asylum and International Operations Directorate at USCIS; and <br><br> RON ROSENBERG, in his official capacity as Director of the USCIS Arlington Asylum Office, <br><br> *Defendants* | Docket No. 1:24-cv-340 <br><br> **VERIFIED COMPLAINT** <br><br> Filed on behalf of Plaintiff, Hezbullah Kazimi <br><br> Counsel of record for this party: <br><br> KNOX MCLAUGHLIN GORNALL & SENNETT, P.C. <br>   Philip J. Seaver-Hall, Esq. <br>     *PA Supreme Court ID No. 330299* <br> 120 West Tenth Street <br> Erie, PA 16501 <br> Telephone: (814) 923-4892 <br> Facsimile: (814) 453-4530 <br> Email: pseaver-hall@kmgslaw.com <br><br> AMICANGELO & THEISEN <br>   Alexandria M. Iwanenko, Esq. <br>     *PA Supreme Court ID No. 330303* <br> 1314 Griswold Plaza – 3rd Floor <br> Erie, PA 16501 <br> alexandria@amicangelotheisen.com |

**VERIFIED COMPLAINT**

Plaintiff, by and through his counsel, files this Verified Complaint against the above-named Defendants, alleging as follows:

**PRELIMINARY STATEMENT**

1. The Plaintiff, Hezbullah Kazimi, is an Operation Allies Welcome parolee seeking asylum in the United States. Mr. Kazimi spent years fighting the Taliban as part of the Afghan National Army, but he was forced to flee Afghanistan in 2021 after the United States withdrew its troops and the Taliban regained control.

2.      Under federal law, Defendants have a maximum of 150 days to adjudicate Mr. Kazimi's application for asylum.  Yet it has now been well over *800* days—nearly *five and a half times* the maximum timeframe allowed by statute—and Defendants have still not acted on his application.  Defendants have not asked Mr. Kazimi for any additional information.  And worst of all, Defendants have provided no reason whatsoever for this egregious and unreasonable delay.

3.      Mr. Kazimi brings this action under the Mandamus Act, the All Writs Act, and the Administrative Procedure Act ("APA").  Kazimi is not asking this Court to grant him asylum; instead, he merely seeks a writ of mandamus, as well as a preliminary and permanent injunction, requiring Defendants to carry out their statutory duty and adjudicate his asylum application.

## PARTIES

4.      The Plaintiff, Hezbullah Kazimi, is a citizen of Afghanistan who currently resides at 615 East 7th Street, Erie, Pennsylvania, 16503.

5.      Plaintiff lawfully entered the United States in August of 2021.

6.      Defendants DHS and USCIS are responsible for processing affirmative asylum applications of persons physically present in the United States.  *See* 8 C.F.R. § 208.2(a).

7.      Defendant Alejandro Mayorkas is named in his official capacity as Secretary of DHS, which has authority to process affirmative asylum applications and does so through USCIS.  In his official capacity, Mayorkas is empowered to grant asylum applications.  *See* 8 U.S.C. § 1158(b)(1)(A).  Mayorkas also is authorized to delegate this power and other powers to subordinate employees of DHS, including employees of USCIS.  *See* 8 U.S.C. § 1103(a)(1), (2), (3), (4).

8. Defendant Ur Mendoza Jaddou is named in her official capacity as Director of USCIS, which has authority to process affirmative asylum applications. See 8 C.F.R. § 208.2(a). In her official capacity, Mendoza is delegated power to administer and enforce certain provisions of the Immigration and Nationality Act ("INA"). See 8 C.F.R. § 100.1. Mendoza oversees asylum officers who decide whether to grant or deny asylum claims. See 8 C.F.R. § 208.19.

9. Defendant Ted. H. Kim is named in his official capacity as Associate Director of the Refugee, Asylum and International Operations Directorate of USCIS, which has the authority to process affirmative asylum applications. 8 C.F.R. § 208.2(a). In his official capacity, he oversees the adjudication of asylum and refugee applications.

10. Defendant Ron Rosenberg is named in his official capacity as Director of the Arlington Asylum Office of USCIS. In his official capacity, he oversees the adjudication of asylum and refugee applications within his office's jurisdiction, including the Plaintiff's application for asylum.

## JURISDICTION AND VENUE

11. The Mandamus Act vests this Court with jurisdiction over Plaintiff's mandamus claim. See 28 U.S.C. § 1361 (stating that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff").

12. This Court also has federal-question jurisdiction over Plaintiff's mandamus and APA claims. See 28 U.S.C. § 1331 (stating that "district courts shall have original jurisdiction of all civil actions arising under" federal law).

13. The APA also clothes this Court with subject-matter jurisdiction. Section 702 of the APA authorizes judicial review of agency actions, and Section 706(1) empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 702, 706(1).

3

14. This judicial district is the proper venue because Defendants are officers, employees, and agencies of the United States and the Plaintiff resides in this district. *See* 28 U.S.C. § 1391(e)(1).

## GENERAL ALLEGATIONS

**I. Mr. Kazimi, his assistance to the United States government, and the Taliban's targeting of Mr. Kazimi and his family**

15. Hezbullah Kazimi was born on May 4, 1995 in Nangarhar, Afghanistan.

16. Mr. Kazimi's family currently lives in Kabul, Afghanistan.

17. In January 2018, Mr. Kazimi joined the Afghan National Army. In accordance with the joint agreements between the Afghan government and NATO forces, Kazimi was trained by the U.S. military to fight the Taliban.

18. Mr. Kazimi married the love of his life, Muska Kazimi, in 2020. The young couple gave birth to a son soon afterwards.

19. In 2020, one of Mr. Kazimi's brothers began working as an interpreter with the U.S. Army.

20. Kazimi and his brother were very careful to hide their efforts to assist the U.S. military.

21. Nevertheless, in February 2021, someone reported Mr. Kazimi and his brother to the Taliban.

22. Soon thereafter, Kazimi and his brother both received threatening letters ordering them to "Stop working for the infidel American government." The letters warned that if Mr. Kazimi and his brother did "not quit working for the Americans . . . *then you are responsible if anything happens to you.*"

23. These letters were stamped with the Taliban's official seal.

24. Even more spine-chillingly, the Taliban would post public death threats on the walls of local mosques. According to Mr. Kazimi, "[t]he whole town would know who the Taliban was targeting next."

25. One day, Mr. Kazimi found his name posted on the wall of his village's local mosque.

26. The Taliban's threats are far from simple bluster. For example, Mr. Kazimi had five cousins, each of whom worked with the Afghan National Police. The Taliban sent each of these cousins threatening letters, but the cousins ignored them. Thus far, the Taliban have killed two of the five cousins. In one particularly gruesome episode, the Taliban murdered one of Mr. Kazimi's cousins by cutting off his head while in uniform.

27. The Taliban's threats and intimidation didn't stop there. On top of their grisly attacks on Mr. Kazimi's family, the Taliban raided Mr. Kazimi's family home. Worse still, the Taliban told people in Mr. Kazimi's village that they had a list of names of people who served the Afghan National Army and the U.S. military. The Taliban has stated that if these people return to their homes, they will be harmed.

28. In August of 2021, Mr. Kazimi made the incredibly difficult decision to flee Afghanistan during the American military's final withdrawal of troops. He was forced to leave behind his wife, his child, his parents, and his siblings.

29. After Mr. Kazimi fled Afghanistan, his 15-month-old son died.

30. Plaintiff's wife, who is still in mourning for their only son, still lives in hiding in Afghanistan. The two lovers have been separated for over three years, unable to comfort one another over the loss of their son. Plaintiff fears for his wife's life—according to Plaintiff, if she is discovered, "[t]he Taliban could take her and god knows what they would do."

## II. The asylum process

31. The INA allows the Secretary of Homeland Security and the Attorney General of the United States to grant asylum to applicants who demonstrate that they (1) have suffered past persecution or (2) have a well-founded fear of future persecution on the basis of their race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1158(b)(1)(A), (b)(1)(B)(i).

32. Asylum provides an individual with the ability to remain in the United States indefinitely, obtain employment authorization, and travel in and out of the country. 8 U.S.C. § 1158(c)(1).

33. When applying for asylum, individuals must submit a Form I-589 Application for Asylum and Withholding of Removal to USCIS. Upon receipt of an I-589 application, USCIS is responsible for processing these applications by collecting and reviewing biometric data, scheduling an interview with an asylum officer, and issuing a final decision approving the application or referring it to the Executive Office of Immigration Review ("EOIR") for adjudication.

34. Following the interview, USCIS must render a final administrative decision on an individual's asylum application. *See* 8 U.S.C. § 1158(d)(5)(A)(iii).

## III. The statutory mandate to adjudicate Plaintiff's application within 150 days

35. In August of 2021, the United States military completed its withdrawal of troops from Afghanistan. The Taliban quickly regained control.

36. The United States government, recognizing the moral imperative to protect and support the Afghan people who aided the United States's efforts in Afghanistan, launched an expedited resettlement effort in August 2021 called Operation Allies Welcome. As part of that operation, the U.S. government evacuated and resettled Plaintiff and other Afghans who passed

6

stringent security and background checks in various cities throughout the United States. The DHS granted humanitarian parole to each person who entered the United States in connection with Operation Allies Welcome, which allowed them to live and work in the United States for a period of time without conferring permanent immigration status.

37. In September of 2021, consistent with the objectives of Operation Allies Welcome, Congress enacted legislation to ensure that this group of people from Afghanistan could safely resettle in the United States and access benefits available to those who entered the United States as refugees. One of those benefits is found in Section 2502 of the Extending Government Funding and Delivering Emergency Assistance Act (the "Emergency Assistance Act"), Pub. L. No. 117-43, 135 Stat. 377 (2021), in which Congress required DHS and USCIS to "expeditiously adjudicate" the asylum applications for Afghans who entered the United States as part of Operation Allies Welcome. According to the statute, in the absence of "exceptional circumstances," USCIS must adjudicate the asylum applications filed by this group of people within 150 days.

38. Specifically, Section 2502(c) of the Emergency Assistance Act provides the following:

> **(c) Expeditious adjudication of asylum applications.**—With respect to an application for asylum under section 208 of the Immigration and Nationality Act (8 U.S.C. § 1158) filed by an individual [citizen or national of Afghanistan] described in subsection (a), *the Secretary of Homeland Security shall*—
>
> > (1) conduct the initial interview on the asylum application not later than 45 days after the date on which the application is filed; and
> >
> > (2) *in the absence of exceptional circumstances, issue a final administrative adjudication on the asylum application within 150 days after the date the application is filed* (emphasis added).

*See* 8 U.S.C.A. § 1101, statutory note.

39. Plaintiff is an individual entitled to have his asylum application adjudicated in compliance with Section 2502(c) because he meets the criteria set forth in Section 2502(a). Specifically, Plaintiff is a citizen of Afghanistan who, after completing security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security, was paroled into the United States between July 31, 2021 and September 30, 2022, the period specified in Section 2502(a).

40. In addition to the specific mandates of Section 2502(c) of the Emergency Assistance Act, the APA requires agencies like DHS to conclude matters presented to them "within a reasonable time." 5 U.S.C. § 555(b).

### IV.     Mr. Kazimi's timely application for asylum

41. Mr. Kazimi lawfully entered the United States in August of 2021 as part of Operation Allies Welcome.

42. On August 26, 2022, Mr. Kazimi submitted his I-589 application, along with supporting documents, to the USCIS Arlington asylum office.

43. USCIS acknowledged receipt of Kazimi's application and stated that, as of August 26, 2022, Kazimi's application was pending.

44. Mr. Kazimi is seeking asylum under Section 241(b)(3) of the INA because he fears that he will be persecuted by the Taliban due to (1) his political opinion and (2) his membership in a particular social group. He explained in his asylum application that, if forced to return to Afghanistan, he fears he will be killed by the Taliban because of his prior employment for the Afghan National Army and his brother's affiliation with U.S. forces.

45. USCIS conducted the required asylum interview with Mr. Kazimi in Arlington, Virginia on November 1, 2022.

8

46. Kazimi underwent a second USCIS interview in Cleveland, Ohio on February 17, 2023. Since then, USCIS has not asked for any additional documentation or information from Mr. Kazimi or his lawyers.

47. Since Mr. Kazimi's second USCIS interview, his lawyers have repeatedly, consistently, and unsuccessfully requested status updates from USCIS.

48. For example, in March of 2024, Mr. Kazimi's lawyer attended the Buffalo Afghan Support Center. There, a USCIS representative advised counsel that there would be follow-up on Kazimi's case soon.

49. Then, on June 18, 2024—nearly two years after Mr. Kazimi filed his asylum application—his lawyer emailed the Arlington asylum office to request an update on the status of his application.

50. The Arlington asylum office's response was unhelpful. They merely said that, "[w]hile we strive to issue final decisions within 150 days of the filing date as required by Congress under section 2502(c) of the Extending Government Funding and Delivering Emergency Assistance Act, it is not always possible to do so. Once we receive all required information, we will process your client's [application] in an efficient manner."

51. Although the Arlington asylum office vaguely alluded to the need for additional "required information," the office has never once notified Mr. Kazimi or his lawyers of what (if any) information is outstanding.

52. In reality, Mr. Kazimi has provided USCIS with all information required for USCIS to adjudicate his asylum application.

53. Although Mr. Kazimi is safe on U.S. soil, his wife is trapped in Afghanistan and has not yet gained entry into the United States. She must await action on Mr. Kazimi's asylum

application before Mr. Kazimi can apply for permission for her to enter the United States and reunite.

54. Mr. Kazimi has exhausted his sources of administrative relief, and no adequate legal remedy is available.

## V. Mr. Kazimi's eligibility and need for asylum

55. Country conditions have worsened since Mr. Kazimi fled Afghanistan in 2021. After the United States withdrew its troops, the Taliban sought revenge against those it viewed as having collaborated with the United States.[1]

56. People like Mr. Kazimi, who worked with the Afghan National Army, face a severe risk of Taliban retribution.

57. Kazimi's risk of harm is especially severe, given his brother's work with the U.S. military.

58. The Taliban has persecuted—and has credibly threatened to continue persecuting—Mr. Kazimi based on his political opinions and membership in a particular social group.

59. Mr. Kazimi meets none of the statutory grounds for denial of asylum. He has never persecuted others, has never been convicted of a crime anywhere in the world, and is not a danger to the security of the United States.

---

[1] *See, e.g.*, The New York Times, *Hunted by the Taliban, U.S.-Allied Afghan Forces Are in Hiding*, Aug. 29, 2021, available at https://www.nytimes.com/2021/08/19/world/asia/taliban-afghanistan-usa.html.

**VI.     Defendants' violations of law and the resulting irreparable harms to Mr. Kazimi**

60.     The statutory deadline to adjudicate Mr. Kazimi's asylum application has long passed. Indeed, as of the date of this filing, it has been more than 800 days since Kazimi filed his I-589 application.

61.     Mr. Kazimi completed all the requirements for a timely adjudication of his asylum application—including attending his asylum interview and providing biometric data—well over a year ago.

62.     Defendants, however, have offered no reason whatsoever—much less an "extraordinary" reason—for this extreme and unreasonable delay.

63.     Mr. Kazimi lives in constant fear that he will be forced to return to Afghanistan, where he would be targeted or killed.

64.     Until Kazimi's asylum application is adjudicated, he will remain in an indeterminate state, uncertain if he will be forced to return to his home country and face persecution or worse.

65.     Furthermore, until Defendants comply with their statutory mandate to rule on Mr. Kazimi's application, Mr. Kazimi will be unable to file the necessary applications to reunify with his family, who he has not seen in over three years.

**COUNT I: FOR MANDATORY INJUNCTIVE RELIEF COMPELLING AGENCY ACTION UNLAWFULLY WITHHELD AND UNREASONABLY DELAYED**

66.     Plaintiff incorporates all previous paragraphs of this Complaint by reference.

67.     The APA requires federal agencies to conclude matters presented to them "within a reasonable time." 5 U.S.C. § 555(b).

68.     The APA entitles individuals aggrieved by an agency action to seek judicial review of the agency's action or failure to act. 5 U.S.C. § 702.

11

69. The APA also empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

70. Although the ultimate decision *whether* to grant asylum is discretionary, the duty to adjudicate Plaintiff's asylum application within 150 days is mandatory. *See, e.g.*, Shenango Inc. v. Apfel, 307 F.3d 174, 193 (3d Cir. 2002) (reiterating that the word "shall" is "generally mandatory when used in a statute"). Accordingly, the adjudication of an asylum application is not a discretionary decision exempt from judicial review. *See* 5 U.S.C. § 701(a)(2) (exempting "agency action . . . committed to agency discretion" from judicial review); *see also* Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 65 (2004) (explaining that under the APA, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be").

71. To determine whether an agency's delay is unreasonable, this Court must consider four factors: (1) "the length of time that has elapsed since the agency came under a duty to act"; (2) "the reasonableness of the delay," judged "in the context of the statute authorizing the agency's action"; (3) "the consequences of the agency's delay"; and (4) "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or [the] need to prioritize in the face of limited resources." Prometheus Radio Project v. Fed. Commc'ns Comm'n, 824 F.3d 33, 39-40 (3d Cir. 2016).

72. In this case, all four factors clearly show that Defendants' delay is unreasonable.

73. Under the first two factors, Defendants have unlawfully withheld and unreasonably delayed ruling on Mr. Kazimi's application. Defendants have failed to adjudicate Kazimi's asylum application within the 150-day deadline mandated by law. Indeed, Kazimi's

application has been pending for well over two years.  Defendants are nearly *seven hundred days* delinquent in adjudicating Kazimi's application, yet they have provided no reason whatsoever for this delay.

74. The consequences of Defendants' delay are grave.  Mr. Kazimi has been left in limbo, unsure of whether he will be allowed to remain in the United States and be reunited with his family, or whether he will instead be forced to return to Afghanistan, where he would face great danger of persecution or worse.  *See, e.g.*, *Kim v. Ashcroft*, 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004) (admonishing that, under the APA, "CIS simply does not possess unfettered discretion to relegate aliens to a state of 'limbo,' leaving them to languish there indefinitely").

75. Finally, any claim by Defendants of administrative prioritization or backlog would be weak at best and suspect at worst.  Mr. Kazimi has already completed his asylum interviews and provided biometric data, and Defendants have not asked for any additional information or documents.

76. Plaintiff has no adequate remedy at law.

### COUNT II: FOR A WRIT OF MANDAMUS COMPELLING DEFENDANTS TO ADJUDICATE PLAINTIFF'S ASYLUM APPLICATION (PLEADED IN THE ALTERNATIVE)

77. Plaintiff incorporates all previous paragraphs of this Complaint by reference.

78. Even if the Court were to hold that relief under the APA is unavailable, Plaintiff would still be entitled to a writ of mandamus compelling Defendants to adjudicate his asylum application.  *See Saavedra Estrada v. Mayorkas*, 703 F. Supp. 3d 560, 562 n.1 (E.D. Pa. 2023) (explaining that mandamus relief may be appropriate where no other redress is available).

79. A plaintiff is entitled to a writ of mandamus whenever he shows that (1) he lacks another adequate remedy, (2) the defendant owes him a clear duty to act, and (3) he has a clear

and indisputable right to the relief sought. *Mallard v. U.S. Dist. Ct. for So. Dist. of Iowa*, 490 U.S. 296, 309 (1989); *Heckler v. Ringer*, 466 U.S. 602, 616 (1984).

80. Plaintiff has no other adequate remedy besides mandamus, as DHS's regulations do not provide a mechanism for asylum applicants to force the agency to comply with its statutory duty to process asylum applications.

81. Under Section 2502(c) of the Emergency Assistance Act, Defendants must adjudicate Plaintiff's asylum application within 150 days. But as of the date of this filing, they have failed or refused to do so.

82. In the general asylum statute, Congress expressly stated that there is no private right of action to force the government to adjudicate an overdue asylum application. *See* 8 U.S.C. § 1158(d)(7). But in the Emergency Assistance Act, which specifically deals with Afghan parolees who assisted the United States, Congress included no such language. *See* 8 U.S.C.A. § 1101, statutory note. Accordingly, under the rules of statutory construction, the INA's disclaimer of a private right of action is inapplicable here. *See, e.g.*, *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (explaining that when Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally" in excluding the provision); *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (explaining that the aforementioned rule of construction "has special force when Congress has targeted specific problems with specific solutions in the context of a general statute").

83. Because Defendants have failed to meet the mandatory deadline and have not articulated any "exceptional circumstances" justifying their egregious delay, Plaintiff is entitled to mandamus relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant him the following relief:

- A writ of mandamus compelling Defendants and their agents to adjudicate Plaintiff's asylum application and to notify Plaintiff of the result;

- A preliminary and permanent injunction compelling Defendants and their agents to adjudicate Plaintiff's asylum application and to notify him of the result;

- An order awarding Plaintiff his reasonable attorneys' fees, costs, and expenses, in accordance with the Equal Access to Justice Act and other applicable law; and

- Any other relief that the Court deems just.

Respectfully submitted,

KNOX MCLAUGHLIN GORNALL & SENNETT, P.C.

By: /s/ *Philip J. Seaver-Hall, Esq.*
PHILIP J. SEAVER-HALL, ESQ.
 PA Supreme Court ID No. 330299
120 West Tenth Street
Erie, PA 16501
Telephone: (814) 923-4892
Facsimile: (814) 453-4530
Email: pseaver-hall@kmgslaw.com

AMICANGELO & THEISEN

By: /s/ *Alexandria M. Iwanenko, Esq.*
ALEXANDRIA M. IWANENKO, ESQ.
 PA Supreme Court ID No. 330303
1314 Griswold Plaza – 3rd Floor
Erie, PA 16501
Telephone: (814) 841-4044
Email: alexandria@amicangelotheisen.com

Counsel for Plaintiff,
Hezbullah Kazimi

# 2561881.v1

## VERIFICATION

Hezbullah Kazimi, being duly sworn, deposes and states as follows:

I am the Plaintiff in this case. I have read the foregoing Verified Complaint through a Pashto/English speaking interpreter, know and understand its contents, and state that all allegations contained therein are true and correct to the best of my knowledge, information and belief.

_____
Hezbullah Kazimi